Filed 7/29/13  Wascher v. Southern Cal. Permanente Med. Group CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| ROBERT WASCHER, | |
| Plaintiff and Respondent, | G047042 |
| v. | (Super. Ct. No. 30-2011-00523323) |
| SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from an order of the Superior Court of Orange County, B. Tam Nomoto Schumann, Judge.  Affirmed.

Davis Wright Tremaine, John P. LeCrone, Portia R. Moore and Francisco Ochoa; Paul Hastings, Paul W. Cane, Jr. and Elizabeth J. MacGregor for Defendants and Appellants.

Pine & Pine, Norman Pine, Beverly Tillett Pine and Janet Gusdorff; The Rager Law Firm and Jeffrey Andrew Rager; The Mathews Law Group and Charles T. Mathews for Plaintiff and Respondent.

*            *            *

Southern California Permanente Medical Group, Kaiser Foundation Health Plan, Inc., and Kaiser Foundation Hospitals (collectively, SCPMG) appeal from the trial court's order denying their motion to compel their former employee, cancer surgeon Dr. Robert Wascher, to arbitrate his claims against them. The trial court concluded SCPMG failed to meet its burden to establish the existence of a valid arbitration contract governing the parties' dispute. SCPMG argues ordinary contract interpretation principles and public policy favoring arbitration require the conclusion the parties mutually agreed to arbitrate their disputes. Specifically, SCPMG relies on a practice-wide, internal dispute resolution agreement that SCPMG contends supplemented Wascher's employment contract and constituted a binding arbitration provision. Wascher highlights numerous flaws in the separate agreement that he claims prevented it from taking effect, alternatively he argues that we may affirm the trial court's ruling because the supposed arbitration supplement is unconscionable. The trial court concluded no arbitration contract was formed, and therefore did not reach Wascher's procedural and substantive unconscionability claims.

On our de novo review, we observe that the arbitration supplement on which SCPMG relies expressly provides it is not controlling because it "shall not supersede and is not meant to supersede" the dispute resolution provisions in "any individual physician's Employee Physician Contract . . . ." Wascher's employee physician contract incorporated by reference certain "Rules and Regulations" detailing applicable dispute resolution procedures, but SCPMG did not ground its motion in those procedures. SCPMG nowhere cites those procedures for our review, nor suggests it furnished them to the trial court or demanded arbitration based on them. Accordingly, it is impossible to determine whether those governing rules and regulations required

2

arbitration in the circumstances here.  Given the absence of the controlling dispute resolution procedures, we affirm the trial court's order denying SCPMG's motion to compel arbitration.

I

FACTUAL AND PROCEDURAL BACKGROUND

In 2008, Wascher served as the director of a surgical oncology hospital division and as a medical professor in New Jersey when SCPMG prevailed over eight other prospective employers to hire him as a cancer surgeon for its Orange County Kaiser hospitals (Kaiser OC).  During the interview process, Wascher noted in an e-mail he hoped "to further establish Kaiser OC as a growing regional cancer referral center" and, while he was "happy to help out with non-Oncology General Surgery cases," he did "not want that non-Oncology volume to uncontrollably grow to the point of overwhelming [his] Oncology practice, as eventually happened with Dr. Litvak," his predecessor at Kaiser OC.

Satisfied in further interviews that his concerns were met and because his wife had family in Orange County, Wascher signed an "Employee Physician" contract with SCPMG in September 2008.  The contract made numerous references to "SCPMG Rules and Regulations" governing the practice.  For example, by virtue of his full-time employment, Wascher would become eligible for partnership after a waiting period, but "[n]othing in this Contract, the Partnership Agreement, *the Rules and Regulations* or employment by SCPMG shall be construed by Physician for any reason as a guarantee to consider Physician for partnership in SCPMG or a guarantee to elevate Physician to partnership in SCPMG."

The contract incorporated under the heading, "Section XII — Dispute Resolution and Arbitration," a dispute resolution mechanism, as follows: "Physician and SCPMG agree to follow the Dispute Resolution Procedure, Rules and Regulations, section 11 [or "section 1*l*," as discussed below], a copy of which is attached" (hereafter, R&R DRP). The parties on appeal provide no record reference for the R&R DRP or the Rules and Regulations as a whole, and we therefore assume neither was introduced below. According to SCPMG, it provided Wascher with the Rules and Regulations and other documents when he signed the contract. SCPMG offers no record citation to suggest it sought to compel arbitration based on the terms of the R&R DRP.

Instead, at the same time Wascher signed his employment contract, he also signed a document entitled, "Dispute Resolution Procedure for All Physicians and SCPMG Approved by SCPMG Board of Directors May 18, 2006" (May 2006 DRP). The May 2006 DRP provided generally that "[i]t is in the interest of SCPMG and its Physicians that any dispute between a Physician and SCPMG be resolved quickly and fairly." More specifically, the agreement stated: "Should any matter remain unresolved after informal efforts have been exhausted, this Dispute Resolution Procedure ('DRP') shall be used as [the] exclusive means for the resolution of such disputes, *except as specified below*." (Italics added.)

Among other exceptions, the May 2006 DRP expressly provided it "shall not supersede and is not meant to supersede the Dispute Resolution and Arbitration provision within any individual physician's Employee Physician Contract or Per Diem Physician Contract." The May 2006 DRP contemplated that its terms might differ from a dispute resolution mechanism incorporated in a physician's contract, and therefore specified: "To the extent the terms of this DRP conflict with the terms of such provision,

4

the individual physician's Employee Physician Contract or Per Diem Physician Contract controls."

For disputes covered by the May 2006 DRP instead of the terms incorporated in an individual contract, the dispute resolution mechanism consisted of five steps labeled, "Process I," "Process II," et cetera, culminating in an arbitration procedure described in "Process V." Process V referenced generally "the relevant dispute rules of the American Arbitration Association," but also specified terms of the arbitral process, including selecting an arbitrator; that each party must bear its own fees; discovery procedures; the arbitrator's authority over prehearing disputes; exceptions to the arbitrator's authority, including no authority to "require SCPMG to adopt new policies or procedures"; complete confidentiality of the proceedings; and other details. Process V's description included the statement: "Any arbitration hereunder shall be before a single arbitrator in accordance with the relevant dispute rules of the American Arbitration Association ('AAA') then in effect (which can be found at the website www.adr.org), except that in the event of any conflict between those rules and those set forth herein, the rules set forth herein shall control."

According to Wascher, once he began working at Kaiser, his relationship with SCPMG progressively soured over the next two years, beginning with demands by Kaiser general surgeons without oncology training "that they be allowed to perform complex cancer [surgeries], including those of the pancreas and stomach," leading to "unusually high complication rates and unexpected patient mortalities." Despite Wascher's complaints, SCPMG management brushed off his concerns as "'the cost of doing business.'" According to Wascher, he "attempted, in a professional and collegial manner, to educate his colleagues on the need for improved patient care" at cancer

5

committee meetings, including by presenting detailed descriptions of procedures with photographs.  Wascher's efforts only bred resentment that he was making the other surgeons "'look bad,'" and elicited critiques that "'[h]e's too book smart'" and "'[w]e don't need any sub-specialists in our Department, because a good general surgeon can do everything.'"

According to Wascher, SCPMG leadership retaliated by closing the highly-regarded "Center of Excellence" for complex cancer surgery that Wascher had initiated with Kaiser's only other specially-trained cancer surgeon.  When that surgeon in response "simply refused to do anymore complex surgical oncology cases," leaving Wascher "with the entirety of the surgery oncology" practice, Kaiser officials repeatedly rebuffed his requests to "reduce his non-cancer general surgery caseload," leading to "significant delays in surgeries [for] cancer patients who urgently needed" treatment.  Matters came to a head in February 2011 when SCPMG formally informed Wascher he would not be considered for partnership and instead that would be fired in August 2011, at the end of the six-month termination notice period he had negotiated in his contract.

In November 2011, Wascher filed suit against SCPMG for wrongful termination, failure to promote him, and other retaliatory employment actions in violation of public policy (Bus. & Prof. Code, § 2056 [barring retaliation against physicians who advocate for patient care]; Labor Code, §§ 970, 6310-6312), promissory fraud, defamation per se, intentional infliction of emotional distress, and unfair business practices.  SCPMG moved to compel arbitration based on the May 2006 DRP.

At the hearing on the motion, given the May 2006 DRP appeared to be a different document than section 11 of the R&R DRP incorporated in Section XII of

6

Wascher's employment contract, the trial court asked SCPMG, "What happened to section 11?"

Counsel for SCPMG replied, "Section 11. Well, we can talk about that first. [¶] That reference — it actually says Section 1-L and that's a reference to the Rules and Regulations of the partnership which is another document that was provided to the plaintiff." The court noted, "Well, gosh, it doesn't look like 1-L," and the following colloquy occurred: "[Counsel:] It's a bad copy, your Honor. [Court:] Uh-huh. [Counsel:] But that's . . . what the reference is to. And that's a reference to a separate document called the Rules and Regulations. So there's the Employment Contract, the [May 2006] Dispute Resolution Procedure, the Rules and Regulations, those are all sent to physician candidates at the time that they [are] made an offer of employment. So that would have been a separate document."

SCPMG did not introduce or address the terms of section 1-L or otherwise explain what, if any, arbitration procedures that part of the Rules and Regulations may have required. Nor did the trial court discuss section 1-L/section 11 further.

Instead, the court explained it found SCPMG's reliance on the May 2006 DRP inadequate to compel arbitration. The court found there was "no meeting of the minds" between the parties about arbitration. Specifically, the court found troublesome the "obscure" reference in Process V directing the prospective employee to the AAA Web site to find the applicable dispute resolution mechanism "then in effect," noting *then* "might be on the date of hire, on the day the dispute arose, on the date the arbitration's demanded, or even when the process is under way." The court also expressed doubt, "[a]ssuming the employee locates and reads the rules found in the AA[A] Web site," about a "layperson . . . determin[ing] which of the myriad AAA rules may conflict" with

7

the May 2006 DRP and ascertaining, between the May 2006 DRP and the AAA rules, "which rules in both documents may be merely supplemental or additional."

The court also took issue with "the arbitrator's apparently unrestricted option to apply either federal or state [arbitration] law" because the prospective hire "does not even know which body of law may be used to interpret the contract or how such a decision might be made." The court further viewed the supposed arbitration terms as too amorphous to constitute a genuine agreement because the May 2006 DRP "allows Kaiser to unilaterally change the DRP terms as it wishes."

The court concluded that "absent adequate notice of the agreement's terms, there can be no contract to arbitrate" and therefore "no contract was formed." Consequently, Wascher's unconscionability challenge was moot because "issues of procedural and substantive unconscionability do not survive" the lack of an arbitral contract. SCPMG now appeals.

II

DISCUSSION

SCPMG contends federal and state arbitration principles and state contract law required the trial court to compel the parties to arbitrate their dispute. Both the California Arbitration Act (Code Civ. Proc., § 1280 et seq.) and the Federal Arbitration Act (FAA; 9 U.S.C. § 1 et seq.) recognize ""“arbitration as a speedy and relatively inexpensive means of dispute resolution"' and are intended '"to encourage persons who wish to avoid delays incident to a civil action to obtain an adjustment of their differences by a tribunal of their own choosing."' [Citation.]" (*St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1204; *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. ___, ___; 131 S.Ct. 1740, 1745 (*AT&T Mobility*).) The fundamental policy underlying both Acts "is to ensure that arbitration agreements will be

8

enforced *in accordance with their terms*." (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 836, fn. 10, original italics; *AT&T Mobility*, at p. 1748.)

Arbitration is therefore a matter of contract. (*Sparks v. Vista Del Mar Child & Family Services* (2012) 207 Cal.App.4th 1511, 1517-1518 (*Sparks*).) The "'"""policy favoring arbitration cannot displace the necessity for a voluntary *agreement* to arbitrate."'' [Citation.] 'Although "[t]he law favors contracts for arbitration of disputes between parties" [citation], "'there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate . . . .'" [Citations.]'" [Citation.] "Absent a clear agreement to submit disputes to arbitration, courts will not infer that the right to a jury trial has been waived." [Citation.]' [Citation.]" (*Id.* at p. 1518, original italics.)

Code of Civil Procedure section 1281.2 requires a trial court to grant a petition to compel arbitration "if [the court] determines that an agreement to arbitrate the controversy exists." (Code Civ. Proc., § 1281.2.) Accordingly, "'when presented with a petition to compel arbitration, the trial court's first task is to determine whether the parties have in fact agreed to arbitrate the dispute. . . .' [Citation.]" (*Gorlach v. Sports Club Co.* (2012) 209 Cal.App.4th 1497, 1505 (*Gorlach*); see also *Sparks, supra,* 207 Cal.App.4th at p. 1517.) "A party seeking to compel arbitration has the burden of proving the existence of a valid agreement to arbitrate. [Citations.] Once that burden is satisfied, the party opposing arbitration must prove by a preponderance of the evidence any defense to the petition. [Citations.]" (*Sparks,* at p. 1518.)

Although the FAA preempts any state law that stands as an obstacle to its objective of enforcing arbitration agreements according to their terms, such as a rule requiring classwide arbitration (see *AT&T Mobility, supra,* 131 S.Ct. at p. 1748), we apply general California contract law to determine whether the parties formed a valid agreement to arbitrate their dispute (*Sparks, supra,* 207 Cal.App.4th at p. 1518; see also *Gorlach, supra,* 209 Cal.App.4th at p. 1505). "General contract law principles include

9

that '[t]he basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting.  [Citations.]  . . .'  [Citation.]"  (*Mitri v. Arnel Management Co.* (2007) 157 Cal.App.4th 1164, 1170 (*Mitri*).)  Contract law also requires the parties agree to the same thing in the same sense.  (Civ. Code, §§ 1550, 1565, 1580; *Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811 (*Weddington*).)

"There is no uniform standard of review for evaluating an order denying a motion to compel arbitration.  [Citation.]  If the court's order is based on a decision of fact, then we adopt a substantial evidence standard.  [Citations.]  Alternatively, if the court's denial rests solely on a decision of law, then a de novo standard of review is employed.  [Citations.]"  (*Robertson v. Health Net of California, Inc.* (2005) 132 Cal.App.4th 1419, 1425.)  Interpreting a written document to determine whether it is an enforceable arbitration agreement is a question of law subject to de novo review when the parties do not offer conflicting extrinsic evidence regarding the document's meaning.  (*24 Hour Fitness, Inc. v. Superior Court* (1998) 66 Cal.App.4th 1199, 1212.)  Here, neither party offered extrinsic evidence, and the de novo standard therefore applies.

The basic flaw in SCPMG's attempt to compel arbitration is that it failed to include the Rules and Regulations pertaining to "Dispute Resolution and Arbitration" incorporated in Wascher's employment contract.  Section XII of the employment contract, entitled "Dispute Resolution and Arbitration," incorporated by reference section 11 (or section "1*l*" or "1-L," as SCPMG explained) of the Rules and Regulations as the parties' agreed-upon method of dispute resolution.  "'"'"It is, of course, the law that the parties may incorporate by reference into their contract the terms of some other document.  [Citations.]"'"'"  (*Wolschlager v. Fidelity National Title Ins. Co.* (2003) 111 Cal.App.4th 784, 790.)  "The contract need not recite that it 'incorporates' another document, so long as it 'guide[s] the reader to the incorporated document.'  [Citations.]"  (*Shaw v. Regents of University of California* (1997) 58 Cal.App.4th 44, 54.)

10

We see no reason to suppose section 11 (or "1l" or "1-L") of the Rules and Regulations was not incorporated in Wascher's employment contract since Section XII of the employment contract clearly referenced it. In contrast, for example, the court in *Chan v. Drexel Burnham Lambert, Inc.* (1986) 178 Cal.App.3d 632, 641, 643-644, refused to enforce an arbitration provision purportedly incorporated into the parties' contract because the contract failed to clearly identify by title the specific document containing the arbitration provision. Here, the employment contract clearly specified the Rules and Regulations contained the applicable dispute resolution procedure, and presumably a cursory review of the Rules and Regulations would dispel any fleeting confusion caused by the similarity in typeface between "11" and "1l." The parties do not argue otherwise, and our de novo review of the plain language in Section XII of the employment contract confirms section 11's incorporation in that contract. The party seeking to enforce an arbitration provision incorporated by reference must establish the provision it seeks to enforce is the same provision to which the parties agreed. (*Kleveland v. Chicago Title Ins. Co.* (2006) 141 Cal.App.4th 761, 765.)

SCPMG, however, instead relied solely on *another* dispute resolution contract Wascher signed (the May 2006 DRP), and the very terms of *that* contract render fatal SCPMG's omission of section 11 of the Rules and Regulations (R&R DRP). *Both* the May 2006 DRP on which SCPMG relies *and* the R&R DRP may well have provided for arbitration as a component of the parties' agreed-upon dispute resolution mechanism. Indeed, it is likely the R&R DRP required some form of arbitration for at least some of the parties' disputes because Section XII of the employment contract was entitled "Dispute Resolution *and Arbitration*" (italics added), and then referred to section 11. But the core problem is that it was SCPMG's burden to establish *what* the parties agreed to arbitrate and to show their current dispute fell within that agreement.

A petition to compel arbitration "'"'is in essence a suit in equity to compel specific performance of a contract.'"'" [Citations.]" (*Mansouri v. Superior Court* (2010)

11

181 Cal.App.4th 633, 641-642; see also *Gorlach*, *supra*, 209 Cal.App.4th at p. 1505.) As with any other specific performance claim, a party seeking to enforce an arbitration agreement must show the agreement's terms "'are sufficiently definite to enable the court to know what it is to enforce.'" (*Real Estate Analytics, LLC v. Vallas* (2008) 160 Cal.App.4th 463, 472; 13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 42, p. 334.) Indeed, a petition to compel arbitration must set forth the provisions of the arbitration agreement verbatim or attach a copy of the agreement and incorporate it by reference. (Cal. Rules of Court, rule 3.1330; *Condee v. Longwood Management Corp.* (2001) 88 Cal.App.4th 215, 218.) "'Only the valid and binding agreement of the parties, including all material terms well-defined and clearly expressed, may be ordered specifically performed.' [Citation]." (*Weddington*, *supra*, 60 Cal.App.4th at p. 817.)

Here, SCPMG's sole reliance on the May 2006 DRP is misplaced because that very agreement specified it "shall not supersede and is not meant to supersede the Dispute Resolution and Arbitration provision within any individual physician's Employee Physician Contract or Per Diem Physician Contract." As discussed above, Wascher's employment contract unmistakably incorporated section 11 of the Rules and Regulations as the parties' dispute resolution protocol. SCPMG now argues on appeal that the May 2006 DRP essentially reiterates the same arbitration terms as section 11. But the May 2006 DRP contemplated that its terms might differ from a dispute resolution mechanism incorporated in a physician's contract, and therefore specified: "To the extent the terms of this DRP conflict with the terms of such provision, the individual physician's Employee Physician Contract or Per Diem Physician Contract controls." In any event, without section 11 of the Rules and Regulations, it is impossible to determine whether the parties' present dispute falls among those they agreed to arbitrate or within an exclusion. Accordingly, our de novo review requires that we affirm the trial court's ruling denying SCPMG's motion to compel arbitration.

III

DISPOSITION

The trial court's order is affirmed.  Respondent is entitled to his costs on appeal.


ARONSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


IKOLA, J.